**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

MYERS DRUG STORE, INC. d/b/a
MYODERM MEDICAL SUPPLY,

      Plaintiff,

          v.

KCBN HOLDING, INC. f/k/a
PROPHARMA GROUP, INC.,

      Defendant.

No. 2:17-cv-

## COMPLAINT WITH DEMAND FOR JURY TRIAL

Plaintiff, Myers Drug Store, Inc. d/b/a Myoderm Medical Supply ("Myoderm" or "Plaintiff"), by and through its attorneys, Fox Rothschild LLP, files this Complaint as follows:

## INTRODUCTION

1.    Plaintiff Myoderm entered into an agreement for Defendant, KCBN Holding, Inc., formerly known as ProPharma Group, Inc. ("ProPharma") to manage the development of a customized, fully-validated software system for Myoderm's pharmaceutical distribution business. ProPharma agreed to provide a full-time, on-site project manager who would supervise the development, testing, and validation of the system.

2.    Although Myoderm relied on ProPharma's alleged expertise in scoping and managing the project and paid ProPharma approximately $200,000, ProPharma failed to achieve any meaningful progress by the initial project deadline. ProPharma instead proposed adding ten months to the development schedule and an additional $263,200 in fees.

3.    Even after more than doubling the timeline and financial commitment, ProPharma failed to fulfill its contractual obligations. When ProPharma unveiled the system for user testing in July 2017, substantial portions of the system had not even been developed, while other portions

of the system were inaccessible or riddled with bugs, requiring the user testing to be canceled mid-stream.

4.      When Myoderm realized the actual status of the project, which ProPharma had grossly misrepresented, Myoderm lost all faith in ProPharma's management of the project and terminated their relationship.

5.      As a result of ProPharma's multiple breaches of the parties' agreement, Myoderm has suffered and continues to suffer substantial damages that it seeks to recover in this Action, including without limitation hundreds of thousands of dollars paid for worthless and ineffective project development services mismanaged by ProPharma.

## PARTIES

6.      Plaintiff, Myoderm, is a corporation organized under the laws of the Commonwealth of Pennsylvania, with a principal place of business located at 328 DeKalb Street, Norristown, Pennsylvania 19401.

7.      Defendant, ProPharma, is a corporation organized under the laws of the State of Kansas, with a principal place of business and a registered agent located at 8717 West 110th Street, Suite 300, Overland Park, Kansas 66210.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1), as this is an action between a citizen of the Commonwealth of Pennsylvania, on the one hand, and a citizen of the State of Kansas, on the other, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Pennsylvania.

## FACTS

### A.      Myoderm Contracted With ProPharma To Manage the Development of a Fully-Customized and Validated Software System.

10.      Myoderm is a leading global distributor of clinical supplies and comparator drugs used for clinical research trials.  Myoderm maintains offices and distribution centers at its headquarters in Norristown, Pennsylvania, and at the headquarters of its United Kingdom subsidiary in Leicester, England.

11.      Myoderm's business includes purchasing, warehousing and distributing pharmaceuticals to companies both in the United States and abroad.  Myoderm is subject to numerous laws, governmental regulations, and quality standards applicable to the pharmaceutical industry.

12.      Myoderm sought to replace its existing software systems by building and implementing a new system known as the Myoderm Distribution Management System ("MDMS").  The MDMS was intended to fulfill most of Myoderm's information management, financial accounting, and recordkeeping requirements, including without limitation functions such as creating quotes for products and services, ordering materials, receiving, inventory control, distribution of products, reverse distribution, secondary labeling, and invoicing in multiple currencies.

13.      In addition, Myoderm intended MDMS to be fully validated pursuant to Good Automated Manufacturing Practice ("GAMP") standards.  GAMP standards are published by an industry trade group called the International Society for Pharmaceutical Engineering and include

guidelines for validating the integrity and functionality of computer systems. While GAMP standards are not mandatory, they are widely accepted as best practices among regulators and the pharmaceutical companies with which Myoderm does business.

14.     GAMP includes five (5) validation levels, the rigorousness of which vary based on the level of customization and risk associated with the software system. As a fully-customized system, MDMS is to be validated as a level 5, or "GAMP 5" system, meaning that it will be subjected to the most rigorous validation standards.

15.     In order to ensure that the MDMS would be developed in a cost-effective and timely manner in accordance with the stringent GAMP 5 standards, Myoderm sought an outside project manager with specific expertise in developing validated software for the pharmaceutical industry.

16.     Myoderm considered a number of potential companies before focusing on ProPharma, which appeared to be ideally suited to the MDMS's requirements. Specifically, ProPharma described its capabilities on its website as including, *inter alia*, the following:

> (a)     "[P]rovides outsourced project management services to the life sciences industry to bring efficient and disciplined rigor for projects of scale, complexity, and importance. We add to an organization's capacity and capabilities to protect and advance their products in the market. Our consultants have significant 'real-world' experience managing projects and are trained in current program management best practices;"

> (b)     "Put[s] our unique combination of leading industry knowledge, breadth of experience, and proven processes to work for you—providing the information you need to deliver safe, effective and quality products every time;" and,

> (c)     "Our consultants have the education and years of advisory and hands-on experience in critical thinking, strategic planning, and design of new processes and

systems. We pride ourselves on providing practical and cost effective solutions for the small to medium size business market."

17.     Myoderm initially was contacted by Joseph Cassella ("Cassella"), an Associate Director of ProPharma, who met with Myoderm to learn about the MDMS project and Myoderm's needs for project management and validation services.

18.     Cassella informed Myoderm that ProPharma would have to spend time learning about the scope of the MDMS project, the status of prior software development efforts, and the work required to complete development and validation before ProPharma could even issue a quote for the requested services.

19.     Given the amount of time required to conduct the necessary due diligence, Cassella proposed that Myoderm pay ProPharma the sum of $6,500 to perform "Project Management & Scoping Services," after which ProPharma would produce a proposal for management and validation services, including a budget and schedule for completing the MDMS project (the "Scoping Services").  Myoderm agreed and executed a written contract for Scoping Services, a true and correct copy of which is attached hereto as Exhibit 1 and incorporated by reference as though set forth in full.

20.     Following execution of the Scoping Services agreement, Cassella came on site at Myoderm's headquarters for approximately a week to meet with Myoderm's key stakeholders and software development contractors and examine documentation relating to the MDMS project.

21.     After completing the Scoping Services, for which Myoderm paid, ProPharma delivered a proposal dated March 23, 2016 (the "Proposal"), a true and correct copy of which is attached hereto as Exhibit 2 and incorporated by reference as though set forth in full.

22.     The Proposal set forth a budget **not to exceed** $199,000 for ProPharma time and materials and a project delivery date of January 2, 2017 (approximately 32 weeks).  The Proposal further stated that the Project Manager to be provided by ProPharma would be available no less than 40 working hours each week.  *See* Exhibit 2 at pp. 5-6.

23.     According to the Proposal, ProPharma would be fully responsible for managing all aspects of software development and validation.  Specifically, the "SCOPE OF SERVICES" to be provided by ProPharma included, without limitation:

(a)     Ensure that the MDMS is appropriately validated according to GAMP5 requirements, and will be considered a Category 5 system.

(b)     **The ProPharma Group resource will provide Project Management services as well [as] performing the validation lead function on this effort.**

(c)     Assist in project planning, monitoring and reporting on performance.

(d)     Develop the Validation Plan and all subsequent validation deliverables […]

(e)     Perform infrastructure qualification activities as they pertain to the MDMS system.

(f)     Train Myoderm users in good software testing practices.

(g)     Ensure that the final validation documentation package is complete, in compliance with US and EU regulatory requirements, and is inspection ready.

 *See* Exhibit 2 at p. 4 (emphasis added).

24.     Critically, the Proposal stated in Section 2.2, "In consultation with the Myoderm project sponsor, ProPharma Group will develop an overall project plan and schedule to define specific milestones against which progress will be tracked.  Status updates will be provided to Myoderm stakeholders on an agreed upon schedule that will summarize progress to date,

upcoming milestones, issue tracking/resolution, and spending against budget." *See* Exhibit 2 at p. 4.

25.    Further, the Proposal stated that it was ProPharma's responsibility to "manage the project's budget, activities, and deliverables," and that "if there are situations beyond ProPharma's control that cause delays whereby the specified number of hours may be exceeded, ProPharma "**will bring a change order discussion to the table before the issue/situation may impact the project's timeline**." *See* Exhibit 2 at p. 11 (emphasis added).

26.    The Proposal touted the "ProPharma Group Experience" in the areas of validation and project management, including:

> (a)    Experience working within the framework of multiple client quality systems, policies, and procedures to ***exceed specific validation and project implementation requirements in a timely and cost effective manner.***

> (b)    ***Leadership and direct contributions in the development of industry best practices*** and standards including GAMP5 and ASTM.

> (c)    ***Certified staff averaging 15 years of experience*** in Pharmaceutical, Biotechnology, and Medical Device consulting and operating company roles.

> (d)    ***Experience as a software product provider,*** with our own quality management system, to support validation activities for both Commercial off the Shelf (COTS) packages as well as in-house developed custom applications.

*See* Exhibit 2 at pp. 6-7 (emphasis in original).

27.    ProPharma's Cover Letter, attached to the Proposal, emphasized ProPharma's understanding that Myoderm was relying on ProPharma's alleged expertise, stating: "Myoderm does not have internal computer system validation resources and will therefore require a qualified partner to assist with the validation of the system . . . Our talented and diverse team of compliance, quality assurance, computer validation, and other professionals has the qualifications and expertise

to assist you with meeting and exceeding your budgetary, timing and compliance goals, priorities and commitments."  *See* Exhibit "B."

28.     Myoderm decided to rely on ProPharma's stated project management and validation expertise in the pharmaceutical industry and engaged ProPharma to manage the MDMS project in accordance with the Proposal.

29.     The individual initially assigned by ProPharma as Project Manager was Jeffrey Kosterich ("Kosterich").  Both ProPharma and Kosterich represented that he was qualified and competent for the position.

**B.     The MDMS Project Stalled While ProPharma Failed To Oversee Its Project Manager.**

30.     ProPharma assigned a Senior Project Manager, Stephen Mullaghy ("Mullaghy"), to oversee Kosterich's work on MDMS.  Mullaghy visited Myoderm's Norristown, Pennsylvania site to ensure that Kosterich had all of the resources he needed to execute the project and concluded that he did.

31.     Upon information and belief, Kosterich almost immediately failed to make significant progress on the MDMS project.  Despite this lack of progress, Kosterich did not disclose to Myoderm that the project was behind schedule or request that Myoderm provide additional internal or outside resources.

32.     To the contrary, Kosterich told Myoderm in a May 16, 2016 e-mail that he believed the gathering and listing of user and functional requirements for the system – which are required steps for GAMP 5 validation -- would be completed "within the next two or three weeks."  In fact, those requirements were **never** completed during ProPharma's approximately 16 months managing the MDMS project.

33.     While Myoderm asked Kosterich on multiple occasions to provide a firm project schedule, he failed to do so.  Eventually Kosterich prepared a project plan on June 10, 2016, which projected that development work would be done in December 2016, thereby indicating that work was on schedule as set forth in the Proposal.

34.     While the project plan prepared by Kosterich anticipated a linear progression through various development stages and GAMP5 requirements -- including without limitation the development of user requirements and functional requirements, software development, user testing, validation, and deployment -- the **only** aspect of the project Kosterich actually finished and got approved during his tenure as Project Manager was the very first stage: creation of the Validation Plan.

35.     The lack of progress by Kosterich was attributable to, *inter alia*, (i) his failure to properly devise and execute an effective development and validation plan, (ii) his failure to properly supervise and deploy the personnel made available to him by Myoderm, and (iii) his failure to ensure that tasks were completed in accordance with the required timelines.

36.     Meanwhile, ProPharma utterly failed in its responsibility under the parties' agreement to adequately supervise Kosterich and ensure that he was meeting project timelines and deliverables.

37.     For example, Cassella originally represented to Myoderm that he would be very involved with the MDMS project and assist as needed.  However, once the project got underway, Myoderm heard from Cassella only infrequently, and he appeared on-site no more than once or twice.

38.     Additionally, although ProPharma conducted a weekly telephonic check-in with Kosterich, in which members of Myoderm's team sometimes participated, the discussions were usually perfunctory, lasting no longer than 10 minutes, and failed to cover any topics of substance.

39.     ProPharma failed to step in and redirect Kosterich even after Myoderm raised concerns to Cassella and Mullaghy about (i) the lack of progress on MDMS and (ii) Kosterich's lack of responsiveness to Myoderm's concerns.

40.     ProPharma's failure to intervene was particularly egregious in light of multiple communications in which ProPharma acknowledged Kosterich's struggles and inadequacies.  For example, in an e-mail sent on September 9, 2016, Cassella admitted that "things aren't getting done as quickly as any of us would like."

41.     In e-mail dated December 7, 2016, Mullaghy stated, "I think we all agree that Jeff's style isn't what's needed for successful completion and that a full time [Project Manager] with a bit of an edge should be brought in to replace Jeff."   In another e-mail exchange, Myoderm's Senior Manager of Quality Assurance complained about Kosterich's lack of cooperation, to which Mullaghy replied, "What a buttface…"

42.     Despite these admissions that ProPharma was aware that the project management was not up to par, ProPharma took no timely steps to improve the situation or otherwise assert control over Kosterich.

**C.      After Kosterich "Resigned," Myoderm Was Forced to Double the Development Timeline and Financial Commitment to ProPharma.**

43.     Despite the parties' agreement requiring the MDMS to be completely developed and validated by January 2, 2017, Kosterich sent an email to Mullaghy and Cassella on November 23, 2016, identifying the project as "behind schedule" and estimating that "the MDMS project should continue through the better part of 2017."

10

44.    Kosterich also stated in the November 23, 2016 e-mail that he unilaterally decided to stop working "full-time" on the project.  Kosterich said that he envisioned remaining on as Project Manager, but only for 20 to 24 hours a week, despite acknowledging how much work still remained to be completed.

45.    Despite ProPharma's obligation to deliver a fully-validated system, Kosterich proposed that Myoderm hire a new validation specialist, presumably to do to the work Kosterich already was required to perform.  Kosterich even went so far as to draft an unsolicited job description for this new validation specialist.

46.    Kosterich lost all interest in managing the MDMS project after announcing his move to part-time status.  For example, Kosterich decided to work from home one day without providing notice to Myoderm and stated in an e-mail that he was "not planning to do much" that day anyway.  Another day, Kosterich opted to work only a half day, again without discussing his decision in advance with anyone at Myoderm.

47.    Kosterich also unilaterally changed the day and time of a standing meeting with Myoderm stakeholders so the meetings would not conflict with "classes" he was taking on Tuesday and Thursday mornings.  However, the new meeting time effectively precluded participation by personnel from Myoderm's UK subsidiary, since their time zone is five hours ahead of Norristown.

48.    After Kosterich effectively checked out of his Project Manager responsibilities, ProPharma proposed to bring in a new Project Manager for an additional 1,600 hours (*i.e.* 40 weeks) at an additional cost of $263,200.  In other words, ProPharma was doubling the project development timeline and Myoderm's financial commitment to ProPharma.

49.    Recognizing the nearly total lack of progress by Kosterich, ProPharma referred to the proposal in an e-mail as a "restart" of the MDMS project.

11

50.     Given the compromised position in which ProPharma placed Myoderm, and facing even greater delays and costs to search for a new project manager and a new validation specialist, Myoderm reluctantly executed a Change Order dated January 19, 2017 in order to mitigate the harm from ProPharma's breaches.  A true and correct copy of the Change Order is attached hereto as Exhibit 3 and incorporated by reference as though set forth in full.

51.     The Change Order did not modify any of the parties' existing obligations, nor did it release ProPharma from liability.  Rather, the Change Order provided a "time extension" for ProPharma to deliver a fully-developed and fully-validated system in accordance with GAMP5 standards.

52.     After execution of the Change Order, Kosterich sent an e-mail on February 22, 2017, following a vacation, announcing his complete resignation from the MDMS project.

**D.     The MDMS Project Continued to Falter and Eventually Fell Apart Under ProPharma's Second Project Manager.**

53.     The second Project Manager provided by MDMS was Dwon Foye ("Foye").

54.     In bringing Foye on board, ProPharma admitted that it failed to diligently oversee Kosterich.  Notably, Cassella wrote in an email to Myoderm that **"[one] of my mistakes was making too many assumptions as to what was happening on a day to day basis**.  I won't make that mistake again." (emphasis added)

55.     As foretold by ProPharma's email referring to Foye's engagement as a "restart," Foye spent much of the time redoing work ostensibly begun under Kosterich.  Indeed, after starting work, Foye decided that the only part of the MDMS project for which Kosterich had gotten approval – the Validation Plan – should be revised.

56.     While Foye focused much of his initial effort on conducting meetings to solicit user requirements, those meetings were poorly managed and ineffective.  The meetings often started

12

late, Foye rarely was prepared, he wasted time reviewing materials that could have been distributed prior to the meetings, and he generally failed to acknowledge or appropriately respond to feedback from UK stakeholders participating by teleconference.

57.     As a result of Foye's failure to effectively respond to feedback and requirements from UK users, the Leicester site manger came to believe that ProPharma largely ignored UK users during the development process.

58.     At ProPharma's request, Myoderm executed a further Change Order authorizing an additional $15,575 in travel expenses for Foye to take two trips to Myoderm's subsidiary in Leicester in March and June, 2017.  Round trip airfare for the two trips was budgeted at $12,000 to accommodate Foye's request to travel business class.

59.     During the March 2017 trip to Leicester, Foye sat in an office by himself for several days, then simply left without conducting substantive meetings or soliciting feedback from UK personnel.  The purpose of Foye's trip was never communicated to Leicester personnel, and he did not accomplish any work that required him to be present in Leicester.

60.     Despite ostensibly providing Foye to "fix" the situation –and despite admitting that it failed to oversee Kosterich and promising not to let it happen again— ProPharma provided even **less** oversight of Foye than it did of Kosterich.

61.     In fact, Foye never put in full workweeks, arriving late in the morning on Mondays after commuting from North Carolina and leaving by approximately 2:00 p.m. every Friday.  On numerous occasions, Foye failed to report to Myoderm's offices and said that he was working from home.  On those days when Foye was not on-site, the development team generally did not hear from him, either by phone or via email.

13

62.     Despite these shortcomings, Foye offered a veneer of progress to Myoderm management, providing optimistic feedback about the status of the MDMS project.

63.     Pursuant to the project development schedule issued by Foye, user testing of the system was to begin in May 2017.  Foye requested an extension of time until July 2017 to begin user testing, which Myoderm granted.

64.     Following the extension, Foye assured Myoderm during weekly status meetings that development was progressing in accordance with the revised schedule.  In an email to Myoderm's CEO dated June 19, 2017, Foye expressly confirmed that the system would definitely be ready for testing on July 10, 2017.

65.     Despite Foye's assurances to Myoderm's management, members of the project development team were privately telling Foye that they did not believe the system would be ready for testing.  Foye told team members not to speak to Myoderm management about their concerns, as he would "handle" Myoderm, but never actually shared any of these concerns with Myoderm.

66.     In fact, Foye was aware before user testing was scheduled to start that substantial portions of the MDMS system had not been developed – meaning that the software code had not been written to implement the functional requirements of the system – and that numerous modules would not be functional.  Foye did not share this fact with Myoderm, but continued to suggest that a fully-functional system would be ready for testing.

67.     Foye recommended a relatively short period of user testing and attempted to limit the number of test scripts to be run on the system.  Foye's recommendations were contrary to good software development practice, since robust user testing is important to identify "bugs" and other deficiencies in the system so that they can be remedied.

68.     At the insistence of Myoderm management, Foye scheduled user testing to last approximately three weeks, with users participating from 8:00 a.m. until 5:00 p.m., and project development personnel scheduled to work 12-hour days from 8:00 a.m. to 8:00 p.m. each day. This schedule required Myoderm to pay significant contractor hours and employee overtime, as well as divert most of its workforce from regular work activities.

69.     Foye took his second trip to the UK for the start of user testing on July 10, 2017. While Leicester employees arrived on site at 8:00 a.m. for the start of testing, Foye failed to arrive until more than 45 minutes later.

70.     The user testing turned out to be an unmitigated disaster.  Users had difficulty accessing the system, as the servers had not been installed until the night before the start of testing. Those who could access the MDMS found that the system was incomplete and full of bugs and glitches, so that the testing exercises were practically worthless.

71.     Despite the visible frustration of Leicester users, Foye was aloof during the testing and, when approached for help, did not seem to understand the system.  In fact, Foye had only logged onto the MDMS just prior to testing and had little knowledge of its features or operation.

72.     The user testing was so unproductive and created such a negative impression on users that it was canceled midstream with the mutual agreement of Myoderm and ProPharma.

73.     Shocked and frustrated, Myoderm began its own investigation into what happened, and learned what Foye already knew – that much of the MDMS was undeveloped, that system (development team) testing had not been conducted on many of the portions that were developed, and that the MDMS was nowhere close to being ready for user testing.

74.     It also became clear to Myoderm that Foye had misrepresented ProPharma's progress, even as Myoderm invested significant money to compensate contractors and employees, devoted employee time and focus to the program, and incurred substantial costs.

75.     In light of ProPharma's egregious breaches of its contractual obligations, and having completely lost faith in the ProPharma's ability to manage the project, Myoderm terminated its relationship with ProPharma in mid-July 2017.

76.     A few days later, Myoderm reached out to Foye asking for the most up-to-date project schedule, as the last update possessed by Myoderm was dated May 23, 2017.  Foye did not respond to that request, and Myoderm believes that Foye had not updated the schedule for nearly two months prior to being terminated from the project.

77.     Myoderm has been forced to engage another individual to act as project manager due to ProPharma's breaches, which has resulted in duplication of effort for the project manager to learn the MDMS system and discern the true state of development.

78.     Given ProPharma's ineffective project management and waste of resources, the MDMS is still at the beginning stages of development approximately 16 months after ProPharma's engagement, and the current projected completion date is November 2018.  Myoderm's costs to complete the work that ProPharma committed to perform and Myoderm's lost profits caused by delays in completion of the system are expected to readily exceed $1,000,000.

## <u>COUNT I – BREACH OF CONTRACT</u>

79.     Myoderm incorporates by reference the allegations set forth in paragraphs 1 through 78 of this Complaint as though set forth in full.

80.     As set forth above, Myoderm paid ProPharma to evaluate the scope of the project in the Proposal, and Myoderm relied on ProPharma's alleged expertise and experience in accepting the Proposal.

81.     As more fully set forth above, ProPharma has materially breached its obligations to Myoderm as set forth in the Proposal, as well as the implied duty of good faith and fair dealing inherent in the contractual relationship.   These breaches include, but are not limited to, the following:

(a)     Failing to deliver a fully-developed and fully-validated MDMS in accordance with GAMP5 standards;

(b)     Failing to complete the project by January 2, 2017, the date set by ProPharma;

(c)     Failing to bring the project in under the agreed-upon budget;

(d)     Failing to reasonably project the scope, length and cost of the project;

(e)     Failing to provide competent and qualified Project Managers;

(f)     Failing to adequately supervise its Project Managers;

(g)     Failing to create and implement an effective project plan and schedule for the development of the MDMS;

(h)     Failing to effectively coordinate and direct the activities of the contractors assigned to the MDMS project development team;

(i)     Failing to identify the necessary resources to complete the MDMS project in accordance with the agreed-upon delivery date;

(j)     Failing to provide full-time project management and provision of agendas and minutes for all team meetings;

(k)     Misrepresenting the project's status and otherwise failing to keep Myoderm adequately informed of progress;

(l)     Failing to effectively manage the project's budget, activities, and deliverables, including a failure to intervene **before** the project was delayed; and

(m)     With the sole exception of the Validation Plan, failing to provide any of the validation deliverables set forth in the Proposal, including the final validation package.

82.     Further, although ProPharma held itself out as an expert in developing and validating software for use in the pharmaceutical industry, it failed at every step of the project to exercise an expert level of care with respect to its obligations under the contract.

83.     ProPharma also breached its obligation to comply with commonly recognized standards in the industry.  By way of example, but not limitation, ProPharma's project managers never gave assigned work or evaluated the work product generated by the project team contractors, and they failed to implement any cogent project plan.

84.     As a result of the breaches by the ProPharma, Myoderm has suffered and continues to suffer significant damages, including but not limited to the following:

(a)     The fees and costs already paid to ProPharma for work that was never completed;

(b)     The costs incurred by Myoderm during the period of ProPharma's project management, which achieved virtually no progress, including without limitation fees and costs paid to MDMS contractors, costs of Myoderm staff time devoted to repetitive, non-productive meetings, costs of re-doing work, and participation in worthless user testing;

(c)     The costs of completing the project, including those already spent and those continuing to accrue on a daily basis, as Myoderm is forced to continue paying

programmers and a new project manager to re-perform work ostensibly done under ProPharma; in some months, these costs have exceeded $100,000;

(d)     Lost opportunity costs, as Myoderm is forced to continue pouring financial and personnel resources into completing the project, instead of using those resources elsewhere in the company; and

(e)     Lost profits of Myoderm caused by delay in completion of the system and in Myoderm's reaping the substantial benefits that the MDMS system will bring.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against ProPharma, awarding it damages in excess of $75,000, plus costs and interest.

## COUNT II – UNJUST ENRICHMENT

85.     Myoderm incorporates by reference the allegations set forth in paragraphs 1 through 84 of this Complaint as though set forth in full.

86.     As set forth above, although Myoderm paid ProPharma in exchange for Scoping Services and the provision of two Project Managers, the work performed by ProPharma was entirely inadequate and generally unusable, requiring Myoderm to restart the MDMS project virtually from the beginning after Myoderm terminated its relationship with ProPharma.

87.     Myoderm received no value in exchange for its payments to ProPharma, and ProPharma's retention of those payments would be inequitable under the circumstances.

88.     In the event that Myoderm is not compensated for any reason, pursuant to Count I, ProPharma would be unjustly enriched by profiting from its work without providing any value in return to Myoderm.

89.     Accordingly, in the alternative to Count I, Myoderm is entitled to restitution of all sums paid to ProPharma for services and deliverables that ProPharma failed to properly provide in connection with the MDMS project.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against ProPharma, awarding it damages in excess of $75,000, plus costs and interest.

<u>**COUNT III – DECLARATORY JUDGMENT**</u>

90.     Myoderm incorporates by reference the allegations set forth in paragraphs 1 through 89 of this Complaint as though set forth in full.

91.     In a letter directed to Myoderm and dated October 27, 2017, ProPharma's general counsel demanded that Myoderm pay an additional $57,009.44 in fees and costs relating to work done under the aforementioned contract.

92.     Myoderm contends that it does not owe any amounts to ProPharma in light of, *inter alia*: (i) the aforementioned material breaches of the parties' agreement, which relieved Myoderm of its obligation to perform; (ii) Myoderm's substantial damages, which far exceed and offset the amounts claimed by ProPharma; and (iii) Myoderm having received no value for the work to which the fees and costs relate.

93.     The legal interests of Myoderm and ProPharma are therefore actually adverse.

94.     A real and substantial controversy exists between Myoderm and ProPharma with regard to the extent of fees and costs, if any, owed by Myoderm to ProPharma.

95.     A judicial declaration as to whether or not any of these fees and costs allegedly owed by Myoderm to ProPharma will be a practical help in resolving the controversy that exists between the parties.

**WHEREFORE**, Plaintiff seeks a judicial declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Myoderm does not owe any further fees, costs, or other compensation to ProPharma for contracted work on the MDMS project.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Myers Drug Store, Inc. d/b/a Myoderm Medical Supply demands a trial by jury in this action of all issues so triable.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

DATED:  November 6, 2017

s/ Christopher Polchin
Christopher Polchin, Esquire
Pa. ID No. 316636
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, Pennsylvania 19422
Telephone:  (610) 397-6500
Facsimile:  (610) 397-0450
cpolchin@foxrothschild.com

Patrick L. Abramowich, Esquire
(*pro hac vice* pending)
Pa. ID No. 74494
BNY Mellon Center
500 Grant Street, Suite 2500
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 391-1334
Facsimile:  (412) 391-6984
pabramowich@foxrothschild.com

*Counsel for Plaintiff,*
*Myers Drug Store, Inc. d/b/a*
*Myoderm Medical Supply*

EXHIBIT 1



Comprehensive Compliance Solutions



# PROPHARMA
## GROUP

A Proposal for

# **Myoderm**

## MDMS Customized Application Validation Consulting

Project Number: MYO086315 Rev 2
Date: February 2, 2016

Experience      Integrity      Commitment



Experience. Integrity. Commitment
1.888.242.0559

February 2, 2016
Annie Zanolli
Sr. Manager Quality Assurance
Myoderm
48 East Main Street
Norristown, PA 19401

Re:     Proposal for Project Management and Scoping for the MDMS Customized Application
        Validation and related services
        ProPharma Group Proposal Number: MYO086315 Rev 2

Ms. Zanolli:

ProPharma Group would like to thank you for providing this opportunity to support Myoderm on
your efforts to validate your MDMS application as well as to evaluate your existing procedures
and recommend/implement updates to these. This proposal is in response to our discussions on
January 19, 2016, and the "CSV RFP Info" document received on November 19th.

We understand that Myoderm has been prototyping the MDMS system, a customized application
over several years.  MDMS is a computerized distribution management system.  It is designed to
ensure that the approved Myoderm business processes are enforced and documented, in a way
that improves efficiency, while meeting global regulatory requirements for computerized
pharmaceutical distribution systems.

ProPharma Group understands that Myoderm does not have internal computer system validation
resources and will therefore require a qualified partner to assist with the validation of this
system.

In order to better clarify the specific deliverables and timelines, it is being proposed that
ProPharma Group will provide Project Management and Consulting services to obtain a clear
picture of the scope of work regarding this validation and procedural assessments.

Our talented and diverse team of compliance, quality assurance, computer validation and other
professionals has the qualifications and expertise to assist you with meeting and exceeding your
budgetary, timing and compliance goals, priorities and commitments.

We look forward to building our relationship with Myoderm by being a resource that your team
can rely on this project and other needs.



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

## TABLE OF CONTENTS

1.  Scope of Services ........................................................................................................... 4
2.  Project Execution and Approach ...................................................................................... 4
3.  Cost Estimate .................................................................................................................. 5
4.  ProPharma Group Eperience ........................................................................................... 5
5.  Terms and Conditions ..................................................................................................... 8
6.  Proposal Validity ............................................................................................................ 9
7.  Date of Availability ........................................................................................................ 9
8.  Non-Solicitation of Personnel ........................................................................................ 9
9.  Assumptions ................................................................................................................. 10
10. Responsibilities ........................................................................................................... 10



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

## 1. SCOPE OF SERVICES

Based upon our conversations, ProPharma Group understands the scope of services to be as follows:

- Review all Myoderm's relevant Validation Life cycle procedures and identify the amount of effort to remediate for better alignment to GAMP5 and best business practices.

- Review the current state of their MDMS system in terms of existing validation documentation that may exist and estimate the amount of effort required to perform a complete validation of the MDMS system in accordance with Myoderm's Quality Management System. This validation will employ the new procedures where appropriate.

- Develop a proposed project plan once the scope is identified. The details of the project plan are defined below.

## 2. PROJECT EXECUTION AND APPROACH

2.1. ProPharma Group will assign a senior resource to the Myoderm facility in Norristown Pennsylvania and meet with Myoderm management and key stakeholders. The purpose of this meeting will be to verify the project scope and expected deliverables.

2.2. In consultation with the Myoderm project sponsor, the ProPharma Group representative will review existing documentation around both Myoderm's SDLC procedures, existing validation documentation of their MDMS system, and meet with the appropriate subject matter experts (SMEs) to clearly define the scope of the MDMS validation.

2.3. Our ProPharma Group representative will coordinate all activities with Myoderm staff within the scope of proposed services. Specific activities that will be managed include:

- Work with the SMEs on identifying procedures that are in scope for editing.

- Work with the SMEs to review the existing documentation around the MDMS system as well as defining the functional scope of the validation effort.

- With Myoderm's input, create a project plan that will detail tasks and deliverables. The plan will define timelines (Level 2 MS Project Schedule) and assign responsibilities for both the remediation of the procedures as well as the validation of the MDMS system.





Experience. Integrity. Commitment
1.888.242.0559

### 3. COST ESTIMATE

ProPharma Group estimates that this evaluation will require one (1) Senior CSV Consultant for one (1) week to perform the scoping services as outlined above.

ProPharma Group will perform work outlined in this proposal on a lump sum basis.

|  | Total |
|---|---|
| Project Management and Scoping Services | $6,500.00 |

### 4. PROPHARMA GROUP EXPERIENCE

ProPharma Group is knowledgeable in validation of manufacturing, laboratory facilities, equipment and processes and supporting computerized systems. We have supported numerous large-scale projects and can provide experienced validation consultants to ensure successful project completion. Given our extensive participation in all types of projects and life cycles, and our group involvement in contributing to industry best practices, we are able to deliver the most current, relevant, and value-adding service to our clients.

The following factors separate ProPharma Group from our competitors:

o   Broad and in-depth *expertise in all GxP related U.S. and International regulations* specifically applicable to life science R&D and Manufacturing, along with backgrounds in compliance with SOX, ISO requirements, and general IT internal auditing practices.

o   A balanced, *risk-based approach* to deliver the most current, relevant, and value-added services and recommendations to client companies including the *assessment, development, and implementation of CSV compliance programs.*



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

o   Experience working within the framework of multiple client quality systems, policies, and procedures to *exceed specific validation and project implementation requirements in a timely and cost effective manner.*

o   Ability to provide *tailored CSV related policies and procedures* to the level of computer system usage and related regulatory and business risk for individual clients.

o   *Leadership and direct contributions in the development of industry best practices* and standards including GAMP5 and ASTM.

o   *Certified staff averaging 15 years of experience* in Pharmaceutical, Biotechnology, and Medical Device consulting and *operating company roles.*

o   *Full range of Computer System Validation (CSV) services* across all four levels of the ISA-95 model and all GAMP categories of systems.

o   *Experience as a software product provider*, with our own quality management system, to support validation activities for both Commercial off the Shelf (COTS) packages as well as in-house developed custom applications.

o   *Hundreds of CSV projects* spanning biopharmaceutical, medical device, pharmaceutical, and radiopharmaceutical manufacturing *within US FDA and EU regulatory environments.*



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

*The following are some examples of successful ProPharma Group Projects:*

| Client | Location | Scope |
|---|---|---|
| Biotechnology | Brooklyn Park, MN | Validation of laboratory, off-the-shelf, and enterprise systems including Empower, Envision, LightCycler, spreadsheets, CALMAN, LIMS, TrackWise, SAP. |
| Pharmaceutical | Norman, OK | Validation of Waters Empower system and StarLIMS laboratory information management system supporting manufacturing QA/QC. |
| Biotechnology | Novato, CA | Project Management of SQL*LIMS and TrackWise system implementations and QA review of CSV documentation. |
| Medical Device | Kalamazoo, MI | Validation of TrackWise and InfinityQS systems. |
| Testing Laboratory | Kalamazoo, MI | Validation of ChemStation, DaCS spreadsheet platform, Empower, and SoftMax Pro. |
| Pharmaceutical | Colorado | Migration of two existing ERP/MRP systems: Financial, Material Management, Production Planning Reviewed system qualification deliverables including • Unit Test, • Integration Test, • Data Migration, and • Final Reports. |
| API, Excipient, Pharmaceutical | Lenexa, KS Irvine, Scotland, St. Louis, MO | Validation of ERP system at multiple sites ranging from initial SD/WM validation to full PR, PP, and QM validation including global harmonization of global supply chain processes. |



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

The Integrated Services we routinely provide are depicted below.



## 5. TERMS AND CONDITIONS

### 5.1    Billing Method and Invoices

ProPharma Group will submit a single invoice upon delivery of the Project Plan. If
Invoice is not paid within thirty (30) days after receipt, late payment charges of 1.0% per



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

month will be added.   Payments can be submitted via check or electronic fund transfer. Please include the applicable invoice number in some manner on your form of payment. Payments can be submitted via check or electronic fund transfer.  Please include the applicable invoice number in some manner on your form of payment.

| Mailing Address if Paying by Check | Routing Information for Electronic Funds Transfer | |
|---|---|---|
| Accounts Receivable | Account Name: | ProPharma Group |
| ProPharma Group | Bank Name: | JP Morgan Chase Bank, N.A. |
| 8717 West 110th Street | Address: | Milwaukee, WI |
| Suite 300 | Routing #: | 075000019 |
| Overland Park, Kansas 66210 | Account #: | 533075813 |

## 6.  PROPOSAL VALIDITY

This proposal is firm for a period of thirty days (30) days from the date of transmittal, after which it is subject to ProPharma Group review and reconfirmation.

## 7.  DATE OF AVAILABILITY

ProPharma Group can begin staffing the project within ten (10) business days of a signed purchase order.

## 8.  NON-SOLICITATION OF PERSONNEL

Myoderm shall not solicit, hire, or contract work to employees or contractors from ProPharma Group for a period of twelve months following the completion of work for this or any project at Myoderm.  In the event an employee or contractor is hired, Myoderm agrees to pay ProPharma Group an equivalent to six (6) months salary of the



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

individual that was solicited, hired, or contracted.

## 9. ASSUMPTIONS

In addition to the approach described in the Scope of Work, ProPharma Group wants to ensure that there is understanding and agreement on all aspects of the project. Therefore, ProPharma Group has described the additional assumptions made in the development of this proposal in the bullet points below. ProPharma Group is open to discuss or modify these assumptions to fit the needs of the project scope, timeline, and budget:

- Equipment, documentation and facilities will be reasonably available for work throughout the duration of the project.
- Myoderm will provide the necessary access to SMEs to aid in the assessment in a timely fashion.
- ProPharma Group representative will supply their own computers. Limited network access will be granted to access printers and the file locations required for evaluating systems, reviewing documents when necessary.

## 10. RESPONSIBILITIES

Myoderm will:
- Provide access to the appropriate SOPs.
- Provide SMEs as needed and in a timely fashion to work with ProPharma Group team members to walk through current business processes around the use of the system.

ProPharma Group will:

- Perform all activities included within the Scope of Services for this project.
- If there are situations beyond ProPharma Group's control that cause delays whereby the estimated time may be exceeded, ProPharma Group will bring a change order discussion to the table before the issue/situation may impact the project's timeline. Therefore, ProPharma Group will not perform out of scope work until a change order has been submitted and written approval has been received from Myoderm.



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

- Manage this project's budget, activities, and deliverables utilizing the ProPharma Group tools listed under the Project Execution Approach section of this proposal.
- ProPharma Group will notify Myoderm of any discrepancies that occur during the assessment as they occur.

Receipt of a signed Purchase Order, Letter of Intent or Final Contract signifies understanding and agreement with all rates, expenses, assumptions, terms and conditions and constitutes a binding contract.

Thank you for the opportunity to present this proposal. We look forward to continuing our relationship with Myoderm. If you have any questions or need additional information, please call me at 919.710.0943 or reach me by email at erik.georges@propharmagroup.com.

Sincerely,



Digitally signed by Erik Georges
DN: cn=Erik Georges, o=ProPharma,
ou=Southeast,
email=erik.georges@propharmagroup.c
om, c=US
Date: 2016.02.02 14:32:20 -05'00'

Erik Georges

ProPharma Group



www.ProPharmaGroup.com

CONFIDENTIAL



Experience. Integrity. Commitment
1.888.242.0559

Signature below represents acceptance of this ProPharma Group proposal and commits
Myoderm to the financial terms and conditions of this proposal. The signatory for Myoderm
must be an authorized officer or representative and able to enter into contractual relationships.

**AGREED AND ACCEPTED:**

**Myoderm:**

By: _____

Printed Name: Annie Zanolli

Title: Sr. Manager QA

Date: 04 Feb 2016

www.ProPharmaGroup.com

CONFIDENTIAL

EXHIBIT 2



Comprehensive Compliance Solutions



A Proposal for

# Myoderm

## MDMS Customized Application Validation Consulting

Project Number: MYO014416

Date: March 23, 2016

Experience    Integrity    Commitment



March 23, 2016
Annie Zanolli
Sr. Manager Quality Assurance
Myoderm
48 East Main Street
Norristown, PA  19401

Re:      Proposal for MDMS Customized Application Validation
         ProPharma Group Proposal Number: MYO014416


Annie:

ProPharma Group would like to thank you for providing this opportunity to support Myoderm on your efforts to validate your MDMS application.

We understand that Myoderm has been prototyping the MDMS system, a customized application over several years.  MDMS is a computerized distribution management system.  It is designed to ensure that the approved Myoderm business processes are enforced and documented, in a way that improves efficiency, while meeting global regulatory requirements for computerized pharmaceutical distribution systems.

ProPharma Group understands that Myoderm does not have internal computer system validation resources and will therefore require a qualified partner to assist with the validation of this system.

Our talented and diverse team of compliance, quality assurance, computer validation and other professionals has the qualifications and expertise to assist you with meeting and exceeding your budgetary, timing and compliance goals, priorities and commitments.

We look forward to building our relationship with Myoderm by being a resource that your team can rely on this project and other needs.



TABLE OF CONTENTS

1.   Scope of Services ..................................................................................................... 4

2.   Project Execution and Approach ............................................................................. 4

3.   Project Schedule ...................................................................................................... 5

6.   Terms and Conditions .............................................................................................. 9

7.   Proposal Validity ..................................................................................................... 10

8.   Date of Availability ................................................................................................. 10

9.   Non-Solicitation of Personnel ................................................................................. 10

10.  Assumptions ............................................................................................................ 11

11.  Responsibilities ....................................................................................................... 12



www.ProPharmaGroup.com

CONFIDENTIAL

## 1. SCOPE OF SERVICES

Based upon our conversations with you and your team, as well as the detailed RFP document, ProPharma Group understands the scope of services to be as follows:

- Ensure that the MDMS is appropriately validated according to GAMP5 requirements, and will be considered a Category 5 system.

- The ProPharma Group resource will provide Project Management services as well performing the validation lead function on this effort.

- Review the draft User Requirement Specification (URS) for format and non-business operation content and assist in revising where necessary.

- Assist in project planning, monitoring and reporting on performance.

- Develop the Validation Plan and all subsequent validation deliverables, with the assistance from the subject matter experts (SMEs) (when preparing test cases, for example).

- Perform infrastructure qualification activities as they pertain to the MDMS system.

- Train Myoderm users in good software testing practices.

- Review the executed test cases along with Myoderm QA.

- Ensure that the final validation documentation package is complete, in compliance with US and EU regulatory requirements, and is inspection ready.

## 2. PROJECT EXECUTION AND APPROACH

2.1. ProPharma Group will begin the project with a kick-off meeting between our assigned resources and the project manager along with Myoderm management and key stakeholders.  The purpose of this meeting will be to verify the overall project scope and expected deliverables along with budget and communication plan.

2.2. In consultation with the Myoderm project sponsor, ProPharma Group will develop an overall project plan and schedule to define specific milestones against which progress will be tracked.  Status updates will be provided to Myoderm stakeholders on an agreed upon schedule that will summarize progress to date, upcoming milestones, issue tracking/resolution, and spending against budget.

2.3. ProPharma Group will coordinate all activities with Myoderm staff within the scope of proposed services.  Specific activities that will be managed include:



- Work with the SMEs on formalizing user, functional and, design specifications.

- Work with the SMEs to configure and test application and operating system level data integrity controls.

- Complete Computer System Validation (CSV) on the MDMS according to Myoderm requirements, including, where applicable, the deliverables in the following table:

| PHASE | DELIVERABLE |
|---|---|
| Planning | -Validation Plan<br>-Validation (System) Risk Assessment |
| Specifications | -Design Specification (DS)<br>-Requirements Specifications (RS)<br>-Requirements (functional) Risk Assessment |
| Verification | -Installation/Operational Qualification Protocol and execution (I/OQ)<br>-Performance Qualification Protocol and execution (PQ)<br>-Traceability Matrix<br>-Draft SOP's (Myoderm) |
| Operations | -Change Management<br>-Incident/Bug Reporting |
| Reporting | -Final Traceability Matrix<br>-Final Validation Summary Report (FVSR) |

## 3.   PROJECT SCHEDULE

Estimated Project Award Date: by March 31, 2016

Estimated Project Start Date: April 11, 2016

Estimated Project Close Date: January 2, 2017

## 4.   COST ESTIMATE

ProPharma Group estimates that it will require one (1) Senior CSV Consultant for an approximate total time of thirty-two (32) weeks to perform the validation services as outlined above. This assumes the consultant will be able to work at least forty (40) hours per week.  Note that the estimation of hours below includes Project Management time as well.



ProPharma Group will perform work outlined in this proposal on a time and materials and a not to exceed basis according to the following estimated hours.  Unused hours will not be billed.   Hours not used on one deliverable may be re-allocated to another deliverable through a no cost change order.   The addition of a second CSV resource may be considered to reduce overall time for the project.

| Labor | $199,000.00 |
|---|---|
| Material | $0.00 |
| Travel / Expenses | $0.00 |
| Subtotal | $199,000.00 |
| Taxes | $0.00 |
| Subtotal | $199,000.00 |
| **Project Total** | **$199,000.00** |

**Cost Model (select one)**
☐ Fixed Price
☐ Time and Materials
☒ Time and Materials (Not to exceed)
☐ Other – Please explain
_____

## 5.   PROPHARMA GROUP EXPERIENCE

ProPharma Group is knowledgeable in validation of manufacturing, laboratory facilities, equipment and processes and supporting computerized systems.  We have supported numerous large-scale projects and can provide experienced validation consultants to ensure successful project completion.  Given our extensive participation in all types of projects and life cycles, and our group involvement in contributing to industry best practices, we are able to deliver the most current, relevant, and value-adding service to our clients.

The following factors separate ProPharma Group from our competitors:

o   Broad and in-depth *expertise in all GxP related U.S. and International regulations* specifically applicable to life science R&D and Manufacturing, along with backgrounds in compliance with SOX, ISO requirements, and general IT internal auditing practices.

o   A balanced, *risk-based approach* to deliver the most current, relevant, and value-added services and recommendations to client companies including the *assessment, development, and implementation of CSV compliance programs.*

o   Experience working within the framework of multiple client quality systems, policies, and procedures to *exceed specific validation and project implementation requirements in a timely and cost effective manner.*



o   Ability to provide ***tailored CSV related policies and procedures*** to the level of computer system usage and related regulatory and business risk for individual clients.

o   ***Leadership and direct contributions in the development of industry best practices*** and standards including GAMP5 and ASTM.

o   ***Certified staff averaging 15 years of experience*** in Pharmaceutical, Biotechnology, and Medical Device consulting and ***operating company roles.***

o   ***Full range of Computer System Validation (CSV) services*** across all four levels of the ISA-95 model and all GAMP categories of systems.

o   ***Experience as a software product provider***, with our own quality management system, to support validation activities for both Commercial off the Shelf (COTS) packages as well as in-house developed custom applications.

o   ***Hundreds of CSV projects*** spanning biopharmaceutical, medical device, pharmaceutical, and radiopharmaceutical manufacturing ***within US FDA and EU regulatory environments.***



www.ProPharmaGroup.com

CONFIDENTIAL

*The following are some examples of successful ProPharma Group Projects:*

| Client | Location | Scope |
|---|---|---|
| Biotechnology | Brooklyn Park, MN | Validation of laboratory, off-the-shelf, and enterprise systems including Empower, Envision, LightCycler, spreadsheets, CALMAN, LIMS, TrackWise, SAP. |
| Pharmaceutical | Norman, OK | Validation of Waters Empower system and StarLIMS laboratory information management system supporting manufacturing QA/QC. |
| Biotechnology | Novato, CA | Project Management of SQL*LIMS and TrackWise system implementations and QA review of CSV documentation. |
| Medical Device | Kalamazoo, MI | Validation of TrackWise and InfinityQS systems. |
| Testing Laboratory | Kalamazoo, MI | Validation of ChemStation, DaCS spreadsheet platform, Empower, and SoftMax Pro. |
| Pharmaceutical | Colorado | Migration of two existing ERP/MRP systems: Financial, Material Management, Production Planning Reviewed system qualification deliverables including • Unit Test, • Integration Test, • Data Migration, and • Final Reports. |
| API, Excipient, Pharmaceutical | Lenexa, KS Irvine, Scotland, St. Louis, MO | Validation of ERP system at multiple sites ranging from initial SD/WM validation to full PR, PP, and QM validation including global harmonization of global supply chain processes. |



The Integrated Services we routinely provide are depicted below.



6.   **TERMS AND CONDITIONS**

   6.1     Billing Method and Invoices

ProPharma Group invoices will be submitted twice each month and are to be paid on a
Net 30 day basis for services provided under a Letter of Intent, Purchase Order, or final
Contract.  If any Invoice is not paid within thirty (30) days after receipt, late payment
charges of 1.0% per month will be added.  ProPharma Group may, after giving seven (7)
days written notice to Myoderm, suspend services under this agreement and withhold all



work product until any outstanding invoices have been paid in full for all services and expenses.  Payments can be submitted via check or electronic fund transfer.  Please include the applicable invoice number in some manner on your form of payment.  Payments can be submitted via check or electronic fund transfer.  Please include the applicable invoice number in some manner on your form of payment.

| Mailing Address if Paying by Check | Routing Information for Electronic Funds Transfer | |
|---|---|---|
| Accounts Receivable | Account Name: | ProPharma Group |
| ProPharma Group | Bank Name: | JP Morgan Chase Bank, N.A. |
| 8717 West 110th Street | Address: | Milwaukee, WI |
| Suite 300 | Routing #: | 075000019 |
| Overland Park, Kansas 66210 | Account #: | 533075813 |

## 7.  PROPOSAL VALIDITY

This proposal is firm for a period of thirty days (30) days from the date of transmittal, after which it is subject to ProPharma Group review and reconfirmation.

## 8.  DATE OF AVAILABILITY

ProPharma Group can begin staffing the project within ten (10) business days of a signed purchase order.

## 9.  NON-SOLICITATION OF PERSONNEL

Myoderm shall not solicit, hire, or contract work to employees or contractors from ProPharma Group for a period of twelve months following the completion of work for this or any project at Myoderm.  In the event an employee or contractor is hired, Myoderm agrees to pay ProPharma Group an equivalent to six (6) months salary of the individual that was solicited, hired, or contracted.



## 10. ASSUMPTIONS

In addition to the approach described in the Scope of Work, ProPharma Group wants to ensure that there is understanding and agreement on all aspects of the project.  Therefore, ProPharma Group has described the additional assumptions made in the development of this proposal in the bullet points below.  ProPharma Group is open to discuss or modify these assumptions to fit the needs of the project scope, timeline, and budget:

- ProPharma Group will be allowed to work at least forty (40) hours per week.
- Equipment, documentation and facilities will be reasonably available for work throughout the duration of the project.
- Myoderm will provide any necessary training to contractors.
- Myoderm will provide the necessary access to SMEs to aid in the assessment in a timely fashion. For this project, the assumption is that 50% of SME's time *on average* will be needed to successfully complete this effort.
- Myoderm will be responsible for executing Performance Qualification (PQ) Testing.
- ProPharma Group SMEs will supply their own computers.  Limited network access will be granted to access printers and the file locations required for evaluating systems, reviewing documents, etc.
- Validation will focus on software functions with regulatory impact.
- It is assumed that some of the required documentation may be developed and reviewed with Myoderm stakeholders remotely using ProPharma Group provided collaboration tools such as SharePoint and WebEx.
- Internal review and formal approval of documentation will be the responsibility of Myoderm. It is assumed that each deliverable will be subject to no more than two (2) review cycles prior to final signature approval, each review lasting no more than five (5) business days.
- Any Standard Operating Procedures (SOPs) necessary is not included.



## 11. RESPONSIBILITIES

Myoderm will:
- Provide access to the appropriate Standard Operating Procedures (SOPs).
- Develop new/versioning of SOP's
- Provide SMEs as needed and in a timely fashion to work with ProPharma Group team (see above for time commitment estimate).
- Myoderm will be responsible for communicating to ProPharma Group resource when internal resources may not be available for project related work with a reasonable notification lead time.
- Complete any required training (i.e., safety, network access, etc.)
- Provide adequate work spaces equal to the number of personnel proposed for this project.  Work spaces shall include printer, copier, and high speed internet access.

ProPharma Group will:

- Perform all activities included within the Scope of Services for this project.
- If there are situations beyond ProPharma Group's control that cause delays whereby the specified number of hours may be exceeded, ProPharma Group will bring a change order discussion to the table before the issue/situation may impact the project's timeline.  Therefore, ProPharma Group will not perform out of scope work until a change order has been submitted and written approval has been received from Myoderm.
- ProPharma Group resource will plan activities that involve Myoderm SME's and communicate this need with reasonable lead time.
- Manage this project's budget, activities, and deliverables utilizing the ProPharma Group tools listed under the Project Execution Approach section of this proposal.
- ProPharma Group will notify Myoderm of any discrepancies that occur during the assessment as they occur.

Receipt of a signed Purchase Order, Letter of Intent or Final Contract signifies understanding and agreement with all rates, expenses, assumptions, terms and conditions and constitutes a binding contract.



Thank you for the opportunity to present this proposal.  We look forward to continuing our relationship with Myoderm.  If you have any questions or need additional information, please call me at 919.710.0943 or reach me by email at erik.georges@propharmagroup.com.

Sincerely,


Erik Georges

ProPharma Group

Signature below represents acceptance of this ProPharma Group proposal and commits Myoderm to the financial terms and conditions of this proposal.  The signatory for Myoderm must be an authorized officer or representative and able to enter into contractual relationships.


**AGREED AND ACCEPTED:**


**Myoderm:**


By: _____

Printed Name: _____

Title: _____

Date: _____



EXHIBIT 3



**PROPHARMA**
GROUP

Experience. Integrity. Commitment.
1.888.242.0559

## PROJECT CHANGE ORDER

| Client: | Myoderm | Contract #: MYO014416 | Change Order Number: | 001 |
|---------|---------|------------------------|----------------------|-----|

**Current PO: N/A**

| Statement of Work / Description of Change (attach as necessary) | | | Estimated Hours X Hourly Rate | | | Estimated Total $ |
|------|-------------|-------|------|------|------|------|
| Item | Description | Hours | Qty. | Rate | | |
| 01 | Time extension for Dwon Foye to act as on-site, day-to-day, project manager. | 560 | 560 | $145/hr | | **$81,200.00** |
| 02 | Time extension for Dwon Foye to act as on-site, day-to-day, project manager, providing acceptable results of line item 01. | 1040 | 1040 | $175/hr | | **$182,000.00** |
| | Services Subtotal | 1600 | 1600 | | | **$263,200.00** |
| | | | Total Estimated Cost: | | | **$263,200.00** |

**Assumptions & Caveats:**

- Provide day-to-day project management to ensure all resourcing maintains their specific responsibilities.
- Ensure, minimally, weekly status meetings are held, with specific agenda prior to and minutes following.
- Schedule weekly meetings with User team with agenda.
- Ensure that the MDMS is appropriately validated, according to GAMP5 requirements, and will be considered a Category 5 system.
- Review the draft User Requirement Specification (URS) for format and non-business operation content and assist in revising where necessary.
- Assist in project planning, monitoring and reporting on performance.
- Develop the Validation Plan and all subsequent validation deliverables, with the assistance from the subject matter experts (SMEs) (when preparing test cases, for example).
- Perform infrastructure qualification activities as they pertain to the MDMS system.
- Train Myoderm users in good software testing practices.
- Review the executed test cases along with Myoderm QA.



www.ProPharmaGroup.com

CONFIDENTIAL



PROPHARMA
GROUP

Experience. Integrity. Commitment.
1.888.242.0559

- Ensure that the final validation documentation package is complete, in compliance with U.S. and EU regulatory requirements, and is inspection ready.
- On site five (5) days a week unless permission granted by Myoderm.
- Full Project plan with milestones within 30 days of start.
- Right to terminate within 90 days if the proposed candidate is determined to not be suitable for this mandate.
- Termination of mandate by Myoderm, after the initial 560 hours, shall be provided with 14-days notice.

Please respond by signing below. If there is no response, the afore-captured scope cannot commence until the Change Order is approved and funded.

Prepared by: _____    Date: __19 January 2017__

Approved by: _____    Date: __19 JANUARY 2017__

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Myers Drug Store, Inc. d/b/a Myoderm Medical Supply

### DEFENDANTS
KCBN Holding, Inc. f/k/a ProPharma Group, Inc.

**(b)** County of Residence of First Listed Plaintiff     Montgomery County, PA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant     Johnson County, Kansas
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Christopher Polchin, Fox Rothschild LLP, 10 Sentry Parkway, Suite 200,
PO Box 3001, Blue Bell, PA 19422 / Tel: 610-397-6500

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 2   U.S. Government
Defendant

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                      *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane      **PERSONAL INJURY** | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product  ☐ 365 Personal Injury - | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability         Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &  ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander         Pharmaceutical |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'  Personal Injury |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability         Product Liability |  | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine      ☐ 368 Asbestos Personal |  | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product    Injury |  | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability         Product Liability |  |  | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle  **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle  ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| ☒ 190 Other Contract | Product Liability  ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Exchange |
| ☒ 195 Contract Product Liability | ☐ 360 Other Personal  ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury         Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  | ☐ 362 Personal Injury -  ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
|  | Medical Malpractice    Product Liability | ☐ 751 Family and Medical |  | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | Leave Act | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights  **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting      ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate | Income Security Act | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence |  | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations  ☐ 530 General |  |  | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -  ☐ 535 Death Penalty | **IMMIGRATION** |  | State Statutes |
|  | Employment     **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities -  ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |  |
|  | Other         ☐ 550 Civil Rights | Actions |  |  |
|  | ☐ 448 Education    ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - |  |  |  |
|  | Conditions of |  |  |  |
|  | Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(a)( )
Brief description of cause:
Breach of contract

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $  In excess of
75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
11/06/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 328 DeKalb Street, Norristown, Pennsylvania 19401

Address of Defendant: 8717 West 110th Street, Suite 300, Overland Park, Kansas 66210

Place of Accident, Incident or Transaction: 328 DeKalb Street, Norristown, Pennsylvania 19401

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))   Yes☐   No☑

Does this case involve multidistrict litigation possibilities?   Yes☐   No☑
*RELATED CASE, IF ANY:*
Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes☐   No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes☐   No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes☐   No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes☐   No☑

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
   (Please specify) _____

B. *Diversity Jurisdiction Cases:*

1. ☑ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
   (Please specify) _____

### ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, _____ Christopher Polchin _____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: November 6, 2017   _____   316636
Attorney-at-Law   Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: November 6, 2017   _____   316636
Attorney-at-Law   Attorney I.D.#

CIV. 609 (5/2012)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| MYERS DRUG STORE, INC., d/b/a MYODERM MEDICAL SUPPLY | : | CIVIL ACTION |
| v. | : | **17** 5009 |
| KCBN HOLDING, INC., f/k/a PROPHARMA GROUP, INC. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.                                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.                                                                             ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)

(f) Standard Management – Cases that do not fall into any one of the other tracks.           ( x )

| | | |
|---|---|---|
| 11/6/2017 | Christopher Polchin | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610-397-6500 | 610-397-0450 | cpolchin@foxrothschild.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

NOV - 6 2017